110 F.3d 1247
 65 USLW 2710, Fed. Sec. L. Rep. P 99,442,
37 Fed.R.Serv.3d 759
 Robert M. RUBIN and Patricia Cohen, Plaintiffs-Appellants,
v.
SCHOTTENSTEIN, ZOX & DUNN, Richard A. Barnhart, Danny L.
Todd, and Gregory A. Todd, Defendants-Appellees.
 No. 96-3017.
 United States Court of Appeals,Sixth Circuit.
 Argued Nov. 21, 1996.
Decided April 15, 1997.
 
 Bernard D. Mazer (argued and briefed), William C. Donahue (briefed), Mazer & Company, Dublin, OH, for Robert M. Rubin, Patricia Cohen.
 Robert W. Trafford (argued and briefed), Porter, Wright, Morris & Arthur, Columbus, OH, Randall W. Knutti, Ulmer & Berne, Columbus, OH, for Schottenstein, Zox & Dunn, Richard A. Barnhart.
 Gary D. Greenwald, Shayne & Greenwald, Columbus, OH, for Danny L. Todd, Gregory A. Todd.
 Before: KENNEDY, BOGGS, and WOOD, Circuit Judges.*
 KENNEDY, J., delivered the opinion of the court, in which WOOD, J., joined. BOGGS, J. (pp. 1257-61), delivered a separate dissenting opinion.
 KENNEDY, Circuit Judge.
 
 
 1
 In this diversity action alleging securities fraud, in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, 15 U.S.C. § 78j(b)(1982); 17 C.F.R. § 240.10b-5 (1996), actual fraud, and constructive fraud, plaintiffs, Robert M. Rubin and Patricia Cohen, appeal the District Court's order denying their motion for entry of final judgment and the order granting judgment on the pleadings on behalf of Schottenstein, Zox & Dunn, and Richard Barnhart ("Barnhart"). On appeal, we must first determine whether we have jurisdiction to entertain this appeal, and, if so, whether the District Court erred in granting judgment on the pleadings.[1] For the reasons that follow, we find we have jurisdiction of the appeal and AFFIRM the judgment of the District Court.
 
 I.
 
 2
 Danny Todd and Gregory Todd are Officers of Medical Designs, Inc. ("MDI"), an Ohio business engaged in the development and sale of various medical equipment. In 1988, MDI was formed to develop and market a pain control device utilizing transcutaneous electrical nerve stimulations, commonly referred to as "TENS". To finance this venture, MDI established a revolving line of credit with Star Bank, National Association. In its first two years of business, MDI experienced significant growth; however, its gross revenues dramatically decreased when, in 1991, an article in the New England Journal of Medicine questioned the effectiveness of TENS. In order to secure additional financing, MDI met with Rubin and James Cohen, of New York, to discuss the plaintiffs' purchase of MDI securities.
 
 
 3
 At the meeting, the Todds informed Rubin and Cohen that Star Bank was not loaning MDI a high enough percentage of MDI's receivables to provide sufficient working capital. MDI surmised that it would need $150,000 additional capital in order to proceed with its business plans. The Todds suggested that plaintiffs invest $150,000 in MDI through a combination of a cash loan and stock purchases. According to plaintiffs, the Todds did not inform them that their loan to MDI and sale of securities to the plaintiffs would constitute a default of loans under MDI's loan agreement with Star Bank, that MDI was in default of other provisions of the loan documents with Star Bank,[2] and that Star Bank would have the right to immediately take possession of the $150,000 investment in MDI.
 
 
 4
 Richard A. Barnhart of the law firm of Schottenstein, Zox & Dunn was legal counsel to MDI. MDI hired Barnhart to issue an opinion as to whether the investment was within MDI's corporate powers and whether the note was authorized by MDI, validly executed and delivered, and enforceable against MDI. Accordingly, Barnhart prepared an Opinion Letter regarding the above. Plaintiffs do not allege the Opinion Letter contains any affirmative misrepresentations. The Opinion Letter does not reference any defaults with Star Bank.
 
 
 5
 Encouraged by the Todds, Rubin contacted Barnhart to discuss the proposed transaction. Barnhart did not inform Rubin that the loan or the issuance of additional shares of MDI would result in a default with Star Bank. Also upon his return from his meeting with the Todds, Rubin met with his attorney, Stephen Weiss, to discuss drafting documents relating to the transaction with MDI. Weiss telephoned Barnhart to discuss the transaction. Barnhart informed Weiss of the financing arrangement between Star Bank and MDI; Barnhart did not inform him that the transaction would trigger a default under the loan agreement.
 
 
 6
 On March 27, 1992, plaintiffs loaned MDI $150,000 and each bought 83.25 shares of MDI common stock. After plaintiffs wired the $150,000 to MDI's bank account at Star Bank, Star Bank froze the account relying on MDI's default by borrowing money.
 
 
 7
 Schottenstein, Zox & Dunn and Barnhart filed a motion for judgment on the pleadings, asserting that the above allegations failed to state a claim. With their response to the defendants' motion for judgment on the pleadings, plaintiffs submitted the affidavits of Rubin and Weiss. These affidavits allege facts not articulated in the amended complaint; they allege that Barnhart made four misrepresentations to the plaintiffs. First, Rubin attested that he asked Barnhart "whether or not Star Bank would continue to finance MDI while we attempted to bring in additional financing." Barnhart answered, "Star Bank would look with favor upon an infusion of $153,000 of capital" by plaintiffs. Second, Barnhart assured him that there "was no problem with the Star Bank and MDI" and that after their investment in MDI, "Star Bank would increase the amount of funding that it was providing to MDI." Finally, Rubin attested that Barnhart told plaintiff that "there was no need to contact Star Bank as part of our due diligence." The District Court accepted these allegations as true in considering the motion for summary judgment.
 
 
 8
 The District Court granted defendant Barnhart's motion on February 18, 1994. The District Court held that Barnhart did not have a fiduciary relationship to the plaintiffs such that Barnhart had a duty to disclose information concerning MDI's relationship with Star Bank. Furthermore, the court ruled that, because plaintiffs were represented by an attorney, they could not properly rely on the representations of MDI's attorney.
 
 
 9
 On March 3, 1994, plaintiffs filed a Notice of Appeal. This Court dismissed the appeal sua sponte, on March 22, 1994, on the ground that there was no final judgment because claims against the Todds were still pending. On June 29, 1994, plaintiffs filed a notice of dismissal voluntarily dismissing Danny Todd and Gregory Todd from the action. Ten months later, on May 4, 1995, plaintiffs filed a motion for entry of final judgment. On December 5, 1995, the District Court denied the motion ruling that the February 18, 1994 order became a final judgment when plaintiffs voluntarily dismissed the Todds from the action. Plaintiffs now appeal from the District Court's denial of their motion for entry of final judgment.
 
 II.
 
 10
 We must first examine whether we have jurisdiction to entertain this appeal. An untimely notice of appeal leaves this Court without jurisdiction to hear the appeal. See Stacey v. Charles J. Rogers, Inc., 756 F.2d 440, 442 (6th Cir.1985); Pryor v. R.C. Marshall, 711 F.2d 63, 65 (6th Cir.1983).
 
 
 11
 Defendants contend that plaintiffs obtained a final judgment below once they dismissed the Todds from this action on June 29, 1994, and, because the plaintiffs did not file their Notice of Appeal until December 29, 1995, their appeal is untimely thus divesting this Court of jurisdiction. Plaintiffs counter that the act of voluntarily dismissing the Todds cleared the way for the District Court to enter final judgment. However, because no order of final judgment was ever entered by the court below, the time period for filing their appeal did not begin to run until the District Court refused to grant their motion for entry of final judgment.
 
 
 12
 Once plaintiffs dismissed the Todds from this action, the case became final for purposes of appeal to this Court. In several instances, this Court has so opined. For example, in Coffey v. Foamex L.P., 2 F.3d 157 (6th Cir.1993), the district court dismissed the plaintiffs' complaint, in part, upon a motion for judgment on the pleadings by the defendants.[3] When plaintiffs appealed to this Court, we dismissed the appeal sua sponte holding that the order was not final because claims still remained. Subsequently, plaintiffs voluntarily dismissed the pending claims without prejudice. That action, this Court ruled, "render[ed] the order final and appealable." Id. at 159. Similarly, in Miles v. Kohli & Kaliher Assocs., Ltd., 917 F.2d 235 (6th Cir.1990), the district court granted summary judgment on behalf of two of four defendants in two separate orders. The plaintiffs subsequently settled with a third defendant and voluntarily dismissed, without prejudice, the last defendant. At the time the plaintiff dismissed the last defendant, we noted that the previous orders granting summary judgment were rendered "final and appealable." Id. at 240.
 
 
 13
 Plaintiffs, however, contend that their appeal could not be perfected at the time they voluntarily dismissed the Todds because the District Court had not entered a judgment in a separate document as required by Rule 58 of the Federal Rules of Civil Procedure. An appeal must be commenced "from a district court to a court of appeals ... within thirty days after the date of entry of the judgment or order appealed from." FED.R.APP.P. 4(a)(1). The thirty day time period ordinarily commences when the district court complies with Rule 58 of the Federal Rules of Civil Procedure. Rule 58, entitled "Entry of Judgment" provides, in pertinent part:
 
 
 14
 Subject to the provisions of Rule 54(b): (1) ... upon a decision by the court that ... all relief shall be denied, the clerk, unless the court otherwise orders, shall forthwith prepare, sign, and enter the judgment without awaiting any direction by the court... Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)...
 
 
 15
 FED.R.CIV.P. 58.
 
 
 16
 The purpose of the separate document requirement is to avoid the uncertainty which often arose in determining from what date the time period for post-verdict motions and appeals should be commenced. FED.R.CIV.P. 58, advisory committee notes to 1963 amendment. As this Court has noted:
 
 
 17
 [The separate document requirement] represents a mechanical change that would be subject to criticism for its formalism were it not for the fact that something like this was needed to make certain when a judgment becomes effective, which has a most important bearing, inter alia, on the time for appeal and the making of post-judgment motions that go to the finality of the judgment for purposes of appeal.
 
 
 18
 Communications Workers of Am. v. United Tel. Co. of Ohio, 491 F.2d 207, 208 (6th Cir.1974) (quoting 6A J. Moore, Federal Practice p 58.04(4.2), at 58-161 (1973)).
 
 
 19
 This Circuit has strictly applied the separate document requirement of Rule 58 in accordance with the United States Supreme Court's decision in United States v. Indrelunas, 411 U.S. 216, 93 S.Ct. 1562, 36 L.Ed.2d 202 (1973), which requires such adherence. Where the district court has rendered an adverse judgment against a party but has not entered a separate judgment, this Court has consistently remanded the case back to the district court for entry of judgment dictating that the appeal be taken from the time the entry is made. See, e.g., Cloyd v. Richardson, 510 F.2d 485 (6th Cir.1975); Communications Workers of Am. v. United Tel. Co. of Ohio, 491 F.2d 207, 208 (6th Cir.1974); Seaton v. Jabe, Nos. 90-1808, 90-1853, 1990 WL 183868 (6th Cir.1990)(unpublished disposition); Rapp Business Corp. v. Eslinger, No. 87-3727, 1987 WL 38903 (6th Cir. Nov.10, 1987)(unpublished disposition); Salyers v. Sec. of Health and Human Servs., No. 85-5237, 1986 WL 16905 (6th Cir. April 8, 1986)(unpublished disposition).
 
 
 20
 Pursuant to the United States Supreme Court's decision in Bankers Trust Co. v. Mallis, 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978), our Court relaxes the separate document requirement only under certain prescribed circumstances. Those circumstances are where the district court intended the order to be final and the parties understood the district court's intent. Specifically, where a party files a notice of appeal within thirty days of a final adjudication and the only defect is that the trial court failed to enter a separate judgment, the court will not decline to hear the appeal until a separate judgment is entered. See Bankers Trust, 435 U.S. at 385, 98 S.Ct. at 1120.
 
 
 21
 In the instant case we must determine whether a separate judgment is needed following the filing of a notice of dismissal in order to confer jurisdiction in this Court. The United States Court of Appeals for the Ninth Circuit in McCalden v. California Library Ass'n., 955 F.2d 1214 (9th Cir.1990), addressed a similar procedural scenario to that here. In McCalden, the district court, on February 11, 1987, dismissed five of plaintiff's eight claims and granted leave to amend one of two claims it did not dismiss. Id. at 1217-218. When the plaintiff did not amend the claim, the court dismissed it with prejudice on March 24, 1987. Subsequently, on March 31, 1987, the plaintiff stipulated to dismiss, without prejudice, the two remaining claims. Almost three months later, on June 19, 1987, the plaintiff moved the district court to enter a final judgment. On July 30, 1987, the district court refused on the ground that its former orders constituted entry of final judgment. Id. at 1218. The plaintiff filed a notice of appeal on February 10, 1988. The defendants argued on appeal that the appeal was untimely because a final judgment accrued when the court filed the stipulation to dismiss the remaining claims on March 31, 1987. Id.
 
 
 22
 Noting that the Ninth Circuit has mechanically applied the separate document requirement, the court held that
 
 
 23
 the district court's various orders did not constitute an "entry of judgment" ... because no separate document of judgment was entered... Our circuit has held fast to a mechanical application of the "separate judgment" rule, requiring all formalities to be observed. Therefore, the time for appeal never began to run, and appellant's appeal is timely.
 
 
 24
 Id. at 1218-219 (citations omitted). Notably, the court did not remand the case for a formal entry of judgment before rendering an opinion. The Ninth Circuit then is of the view that a stipulated dismissal should not operate to begin the time-period for filing a notice of appeal absent a formal entry of judgment by the district court.
 
 
 25
 In contrast, the Eleventh Circuit has opined that an order granting a motion for voluntary dismissal " 'qualifies as a final judgment for purposes of appeal.' " McGregor v. Board of Comm'rs of Palm Beach County, 956 F.2d 1017, 1020 (11th Cir.1992) (quoting Yoffe v. Keller Indus., Inc., 580 F.2d 126, 129 (5th Cir.1978)). Accordingly, in McGregor, when the plaintiff attempted to appeal from a voluntary dismissal more than thirty days after the entry of the dismissal, the court concluded that the appeal was untimely. Id. Unlike in McGregor, where the court entered an order granting voluntary dismissal, Rubin and Cohen merely filed a notice of dismissal with the district court. In the instant case, there was no motion filed and thus no order disposing of the case.
 
 
 26
 In arriving at a conclusion on this issue, we must be mindful of the Supreme Court's words in Bankers Trust:
 
 
 27
 Technical application of the separate-judgment requirement is necessary ... to avoid the uncertainties that once plagued the determination of when an appeal must be brought... The need for certainty as to the timeliness of an appeal, however, should not prevent the parties from waiving the separate-judgment requirement where one has accidentally not been entered. As Professor Moore notes, if the only obstacle to appellate review is the failure of the District Court to set forth its judgment on a separate document, "there would appear to be no point in obliging the appellant to undergo the formality of obtaining a formal judgment." "[I]t must be remembered that the rule is designed to simplify and make certain the matter of appealability. It is not designed as a trap for the inexperienced... The rule should be interpreted to prevent loss of the right of appeal, not to facilitate loss."
 
 
 28
 Bankers Trust, 435 U.S. at 386, 98 S.Ct. at 1120-21 (citations omitted). Thus, Bankers Trust instructs that an appellate court should avoid the loss of an appeal due to confusion and avoid compliance with technicalities only when the parties have assumed that the time for appeal had begun to run and proceeded accordingly. We are not faced here with a situation where the parties have waived the separate document requirement; instead, we are presented with a party who has waited for technical compliance with Rule 58. Were we to excuse the District Court from technical compliance with Rule 58, we would facilitate the loss of an appeal where confusion arose as to whether a final judgment was entered, an approach which the Supreme Court forbade in Bankers Trust. Our Circuit has indeed noted that Bankers Trust mandates technical application of the separate document requirement where appellate jurisdiction may be lost. In Reid v. White Motor Corp., 886 F.2d 1462 (6th Cir.1989), we stated, "the Court reaffirmed the doctrine that under the circumstances where the failure to comply with the separate document rule has created confusion which sabotages appellate jurisdiction, the separate document requirement should continue to be mechanically applied." Id. at 1466-67.
 
 
 29
 Thus, in order to prevent loss of the right of appeal rather than facilitate loss, we apply the mechanical requirements of Rule 58 and conclude that the time for appeal has not run.[4] Although the technical requirement of Rule 58 has not been satisfied and the District Court erred in failing to grant plaintiffs' motion for entry of final judgment, in the interest of conserving judicial resources we will proceed to address the merits without remanding the case back to the District Court for the technical entry of a final judgment.
 
 III.
 A. Standard of Review
 
 30
 While the District Court purported to dismiss plaintiffs' claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, where, as here, the District Court considers evidence outside the pleadings, the standard of review for summary judgment applies. See Fugarino v. Hartford Life and Accident Ins. Co., 969 F.2d 178, 182 (6th Cir.1992). That the District Court referred to its own action as a dismissal for failure to state a claim is not dispositive. Rather, in determining the standard of review, this Court looks to the substance of the district court's action. See Bell v. Chesapeake & Ohio Ry., 929 F.2d 220, 221-22 (6th Cir.1991).
 
 
 31
 This Court's review of a grant of summary judgment is de novo; we use the same test as used by the district court. See Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). We view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Under Fed.R.Civ.P. 56(c), summary judgment is proper if the evidence " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988)(quoting FED.R.CIV.P. 56(c)).
 
 B. Section 10(b) and Rule 10b-5
 
 32
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe..." 15 U.S.C. § 78j. Pursuant to this statute, the Securities Exchange Commission promulgated Rule 10b-5 which provides, in pertinent part:
 
 
 33
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 
 
 34
 (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or
 
 
 35
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 36
 in connection with the purchase or sale of any security.
 
 
 37
 17 C.F.R. § 240.10b-5 (1996).
 
 
 38
 In order to prevail on a claim for securities fraud under Section 10(b), a plaintiff must establish the following four elements: (1) misrepresentation or omission of a material fact; (2) scienter; (3) justifiable reliance; and (4) proximate cause. See Aschinger v. Columbus Showcase Co., 934 F.2d 1402, 1409 (6th Cir.1991). Whether a plaintiff has justifiably relied on a misrepresentation is judged by a recklessness standard in our Circuit. See Molecular Tech. Corp. v. Valentine, 925 F.2d 910, 918 (6th Cir.1991). In Molecular Technology, we cited the following eight factors which should be considered in determining whether reliance is reckless:
 
 
 39
 (1) The sophistication of expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.
 
 
 40
 Id. Where a plaintiff alleges a securities violation based on omissions of material facts, reliance may be presumed. The presumption may be rebutted by the defendant by showing, by a preponderance of the evidence, that "even if the material facts had been disclosed, plaintiffs' decision to purchase securities would not have been different." Id.
 
 
 41
 In plaintiffs' amended complaint, plaintiffs allege the defendants committed securities fraud by failing to speak when they had a duty to speak. Subsequently, plaintiffs, in affidavits submitted in response to the defendants' motion for judgment on the pleadings, alleged that the defendants committed securities fraud by making misstatements of material facts. Under either scenario, we must determine under what circumstances a lawyer and/or law firm may be liable under Section 10(b).
 
 
 42
 In Molecular Technology Corp. v. Valentine, 925 F.2d 910 (6th Cir.1991), we held that an attorney may be liable for losses incurred by several investors where the attorney prepared the offering circular in conjunction with a merger and failed to disclose
 
 
 43
 that 60,000 shares (representing about 90% of the outstanding shares) of State Die were in escrow; ... that the title to the real property of State Die, which was part of the consideration in the merger with Extra Production, was held by an unrelated leasing company and, thus, not transferable ... and ... that State Die had substantial debts, including one $194,000 bank debt.
 
 
 44
 Id. at 918. This Court concluded that "[t]aking this evidence in the light most favorable to the plaintiffs, a reasonable jury could find that Snyder knew certain information in the amended offering circular was misleading and that Snyder had a duty to disclose that information to investors such as the plaintiffs under 10(b)/rule 10b-5." Id. Our Court further added that, "Snyder's participation in editing the information statement prepared for the purpose of marketing SDE's stock ... and in drafting an opinion letter for SDE's board of directors regarding the traceability of common stock, while not overwhelming, also implicated him in the alleged fraudulent scheme." Id.[5]
 
 
 45
 Examining first the allegation that Barnhart and his law firm are liable under 10(b) for failing to disclose, either verbally or in the Opinion Letter, the defaults with Star Bank, we must first consider the scope of the attorney's duties. Unlike the attorney in Molecular Technology, the attorney here was not employed to prepare an offering circular. Barnhart's opinion did not relate to the terms of loans made by Star Bank. While Snyder's offering circular was misleading, Barnhart's opinion was not.
 
 
 46
 In this regard we find cases from the Fourth and Ninth Circuits instructive. In Schatz v. Rosenberg, 943 F.2d 485 (4th Cir.1991), the Fourth Circuit held that the silence of an attorney does not give rise to a securities violation absent a duty to disclose. In Schatz, MER Enterprises purchased an eighty percent interest in two companies owned by the plaintiffs. As payment for the eighty percent interest, plaintiffs received $1.5 million in promissory notes issued by MER. In accepting the notes, the plaintiffs relied on a financial statement and an update letter delivered at closing indicating that the net worth of Mark Rosenberg, the creator of MER, exceeded $7 million. The financial documents failed to disclose that Rosenberg's largest company had filed for bankruptcy and that Rosenberg himself had filed for bankruptcy. Rosenberg and his entities were represented by a law firm named as a defendant in the suit. Id. at 488. The plaintiffs alleged that the law firm violated Section 10(b) by remaining silent when it knew that Rosenberg was financially insolvent.
 
 
 47
 Noting that "[s]ilence, absent a duty to disclose, does not violate section 10(b) and Rule 10b-5," the court framed the issue for its determination as whether "federal securities laws impose upon an attorney a duty of disclosure to third parties who are not the attorney's clients." Id. at 490. Recognizing that a duty to disclose arises only where " 'a fiduciary or other similar relations of trust and confidence' " exists between parties, the court held that a lawyer or law firm is not liable for failing to disclose information about their client to a third party unless some fiduciary or other confidential relationship exists with the third party. Id. Because no fiduciary or confidential relationship existed between the law firm and the plaintiffs in Schatz, the court refused to hold the firm liable under Section 10(b). The court carefully distinguished the facts before it from cases where an attorney issues a misleading legal opinion and from cases where an attorney drafts false prospectuses or other securities documents and therefore makes affirmative misrepresentations in connection with the solicitation of securities. Id. at 491-92.
 
 
 48
 In Roberts v. Peat, Marwick, Mitchell & Co., 857 F.2d 646 (9th Cir.1988), investors contended that a law firm violated Section 10(b) by failing to include in a title opinion regarding property purchased by the investors that another party had an interest in the same property and that the law firm represented the interested party. Id. at 653. After stating the rule that the law firm need have only included the omitted information if it had a duty to disclose it, the Ninth Circuit concluded that the law firm had no duty to disclose in light of the following facts. First, the law firm was retained only to determine the marketability of the title and, therefore, the only duty owed the plaintiff concerned the issue of marketability. Second, the plaintiff had equal access to the records examined by the law firm, and lastly, the law firm did not initiate the transaction in securities. Id. at 654.
 
 
 49
 Molecular Technology, Schatz, and Roberts recognize that an attorney may be liable for securities fraud for failure to disclose where there exists a confidential or fiduciary relationship between the attorney and the third party. Here, like in Molecular Technology, Schatz, and Roberts, there is no confidential or fiduciary relationship. We reject outright plaintiffs' claim that an attorney-client relationship existed between plaintiffs and Barnhart. Where, however, the attorney omits material information directly relevant to the specific purpose for which the attorney was hired, courts are inclined to hold counsel liable. See Molecular Technology, 925 F.2d 910; Schatz, 943 F.2d 485; Roberts, 857 F.2d 646; see also Kline v. First W. Gov't Secs., Inc., 24 F.3d 480, 490 (3d Cir.1994). Barnhart was hired only to draft an opinion letter stating the law firm's view as to whether the investment was within MDI's corporate powers and whether the note was authorized by MDI, validly executed and delivered, and enforceable against MDI. The scope of the attorney's duties, thus, did not include informing investors of the financial stability of the borrower. The status of loans to MDI from Star Bank was not relevant to those issues upon which Barnhart was hired to issue an opinion. Also, as in Roberts, there was nothing to prevent plaintiffs here from accessing the information relative to Star Bank; they could have ascertained for themselves the status of Star Bank's loans to MDI.[6] Thus, we conclude liability cannot be premised on Barnhart's failure to speak where he had no duty to speak.[7] While plaintiffs' complaint does not allege affirmative misrepresentations, their affidavits do and the District Court considered them. We do so as well.
 
 
 50
 Assuming, as did the District Court, that Barnhart made the four statements alleged by plaintiffs, we next consider whether there is any genuine issue of material fact as to whether the four statements constitute a violation of Section 10(b). The statements, "Star Bank would look with favor upon an infusion of $153,000 of capital," "[there is] no problem with the Star Bank and MDI," and "Star Bank would increase the amount of funding that it was providing to MDI" are more akin to opinions than to affirmative statements of fact. However, as noted by this Court in Mayer v. Mylod, 988 F.2d 635 (6th Cir.1993), the United States Supreme Court in Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), "rejected the argument that statements containing opinions or beliefs ... could not be a basis for" an action for securities fraud. Mayer, 988 F.2d at 638. "[S]tatements which contain the speaker's opinion are actionable under Section 10(b) of the Securities Exchange Act if the speaker does not believe the opinion and the opinion is not factually well-grounded." Mayer, 988 F.2d at 639. Assuming that Barnhart knew information to the contrary, to make such statements as "Star Bank would look with favor upon an infusion of $153,000 of capital," "[there is] no problem with Star Bank and MDI," and that after their investment in MDI, "Star Bank would increase the amount of funding that it was providing to MDI" misrepresent the status of MDI's financial relationship with Star Bank. These opinions, if knowingly false when made, may be sufficient, particularly when viewed collectively, to amount to the material misrepresentation that Star Bank would not interfere with or impede the infusion of capital into MDI.
 
 
 51
 On the record, however, even if Barnhart knew of the financial status of MDI's loans from Star Bank these misrepresentations alone do not give rise to liability under Section 10(b); the plaintiffs must have justifiably relied on the misrepresentations to impose liability upon the defendants. It is here that plaintiffs' claim against Barnhart fails. As the Second Circuit in Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011 (2d Cir.1989), concluded, a party's reliance on another attorney where the party is represented by its own and has access to the relevant information is unjustifiable. In Royal American Managers, Royal American Managers ("RAM") sought to purchase IRC Holding Corp. The Vice-Chairman of RAM proposed purchasing 50% of IRC's stock. IRC rejected the proposal since a 50% transfer might require approval of the New York State Insurance Department ("NYSID"). The parties decided to contact the attorney for IRC and seek his advice as to whether such a sale would require NYSID approval. The attorney opined that a 50% sale would require approval but that a 49% sale would not. Id. at 1014. At a later meeting, the same attorney reiterated that a 49% sale would not require approval. RAM ultimately purchased 49% of IRC stock. When NYSID learned of the purchase it informed IRC counsel that prior approval was necessary. RAM filed suit alleging, inter alia, that counsel for IRC committed securities fraud in violation of Section 10(b). During trial, the district court dismissed all of RAM's claims against the attorney. Id.
 
 
 52
 On appeal, the Second Circuit held that the district court properly dismissed the claims against the attorney because RAM did not act with the necessary diligence to justify its reliance on the attorney's statement that a 49% sale would not require prior approval by the NYSID. The court so held for three principal reasons. First, "RAM was controlled by businessmen with knowledge of, and many years of experience in, the insurance business." Id. at 1016. Second, RAM was represented by its own attorney. Third, all parties had access to the relevant information and therefore the opportunity to detect the alleged misrepresentation. Id. We agree with the Second Circuit that where, as is the case here, a party has relied on another attorney when it is represented by its own and has the opportunity to learn of the true facts, reliance is unjustifiable. This is particularly true in this case where the statements made by Barnhart were lacking in specificity and where Barnhart told both plaintiffs and their counsel that he did not believe the bank would permit plaintiffs to acquire a secured interest in a loan to MDI.
 
 
 53
 Regarding Barnhart's statement to plaintiff that "there was no need to contact Star Bank as part of our due diligence," we find this statement clearly insufficient to create liability. First, it is not a material misrepresentation regarding the sale of the securities themselves. Moreover, plaintiffs would not have acted reasonably in relying on anyone other than their own counsel's advice as to what constitutes a reasonable investigation on the part of an investor. We, therefore, conclude that there is no genuine issue of material fact regarding whether Barnhart's statements amounted to securities fraud under Section 10(b).
 
 
 54
 Plaintiffs additionally contend that defendants, if not primary violators of Section 10(b), were aiders and abettors of securities fraud. Plaintiffs' cause of action against the defendants under an aiding and abetting theory, however, is no longer viable since the United States Supreme Court's decision in Central Bank v. First Interstate Bank, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In Central Bank, the Court held that "[b]ecause the text of § 10(b) does not prohibit aiding and abetting, ... a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." Id. at 191, 114 S.Ct. at 1455.
 
 
 55
 C. State Law Claims for Actual Fraud and Constructive Fraud
 
 
 56
 In order to maintain a cause of action for actual fraud under Ohio law, the following elements must be proved: (1) an actual or implied material misrepresentation or concealment of a matter of fact; (2) knowledge of the falsity, or such utter disregard and recklessness toward the truth or falsity of the representation that knowledge may be inferred; (3) intent to mislead; (4) reasonable reliance; and (5) resulting injury. See DiPietro v. DiPietro, 10 Ohio App.3d 44, 46, 460 N.E.2d 657 (1983); Reiner v. Kelley, 8 Ohio App.3d 390, 392, 457 N.E.2d 946 (1983). Constructive fraud is distinguished from actual fraud in that a party need not prove the element of intent. See Perlberg v. Perlberg, 18 Ohio St.2d 55, 58, 247 N.E.2d 306 (1969).
 
 
 57
 The claims against Barnhart and his law firm for fraud under Ohio law suffer from the same defects as the plaintiffs' claims under Section 10(b). For a claim based on an omission or a false representation to be successful under Ohio law, the plaintiffs must have relied on the omission or misrepresentation and such reliance must have been justifiable. Because we conclude that plaintiffs' reliance on Barnhart's representations was not reasonable for purposes of Section 10(b) liability, the District Court also properly dismissed these state law claims.
 
 IV.
 
 58
 For the foregoing reasons, the judgment of the District Court is AFFIRMED.
 
 
 59
 BOGGS, Circuit Judge, dissenting.
 
 
 60
 The court's assessment of attorney Barnhart's role is wrong as a factual matter (insofar as we must take the plaintiffs' allegations as fact), and its conclusions as to what Rubin should have been able to expect of the other party's attorney are wrong as a matter of law. The court sets far too high a standard for plaintiffs in securities-fraud actions, and consequently, far too low a standard of legal responsibility for issuers' lawyers. I therefore dissent.
 
 
 61
 The special problems of this case arise because Barnhart was attorney for the securities issuer. Let us ignore that apparently privileged status for a moment, and analyze Barnhart's actions as we would for any other participant in the sale of securities. Although under Rule 10b-5(2), "only those individuals who had an affirmative obligation to reveal what was allegedly omitted can be held liable as primary participants in the alleged deception [, a] duty to disclose naturally devolve[s] on those who h[ave] direct contacts with 'the other side.' " SEC v. Coffey, 493 F.2d 1304, 1315 (6th Cir.1974). "Direct contacts may take many forms. An accountant or lawyer, for instance, who prepares a dishonest statement is a primary participant in a violation [i.e. subject to primary liability] even though someone else may conduct the personal negotiations with a security purchaser." Id. at 1315 n. 24. "A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant." SEC v. Washington County Util. Dist., 676 F.2d 218, 223 (6th Cir.1982). The conversations between Barnhart and the plaintiffs were clearly instances of the "direct contacts" that we have repeatedly held create a duty to disclose, and under this test, Barnhart's omissions should expose him to liability under Rule 10b-5.
 
 
 62
 Another approach to determining the existence of a duty to disclose is found in Roberts v. Peat, Marwick, Mitchell & Co., 857 F.2d 646 (9th Cir.1988), a case cited by the court, in which a law firm was found not liable for securities fraud because it had no duty to disclose certain information. That court stated:
 
 
 63
 The court determines whether a duty to disclose exists by examining five non-exclusive factors...
 
 
 64
 1. the relationship of the defendant to the plaintiff;
 
 
 65
 2. the defendant's access to information as compared to the plaintiff's access;
 
 
 66
 3. the benefit that the defendant derives from the relationship with the plaintiff;
 
 
 67
 4. the defendant's awareness of plaintiff's reliance; and
 
 
 68
 5. the defendant's activity in initiating the securities transaction in question.
 
 
 69
 Id. at 653.
 
 
 70
 Here, the second, third, and fourth factors clearly support a duty to disclose. With respect to the third, it was obviously in Barnhart's interest for his long-time client to obtain financing that would keep it in business, and with respect to the fourth, the plaintiffs' reliance should have been apparent to Barnhart. As for the second factor, the court seems to accept the defendants' assertion that Rubin and Weiss could have discovered the true condition of the Star Bank relationship "for the price of a phone call." I find nothing in the record to support the court's conclusion that Plaintiffs "could have ascertained for themselves the status of Star Bank's loans to MDI." (Op. at 1256). Although the court states, at note 6, that the default provisions are contained in documents that the Todds had, but did not produce, the default condition of the loans was not in those documents. That information was in the hands of Star Bank. I would hope that as a matter of business practice, if not of law, a bank would not divulge details of a customer's credit standing without express authorization from that customer.[1] In this procedural posture, the contrary should not be assumed. (Without meaning to cast aspersions on Star Bank, I note that it was also in the bank's interests for Rubin to send money to MDI; so, as far as the court knows, there might have been a double barrier between Rubin and the truth.) Of course, if in response to an inquiry from Rubin and Weiss, Star Bank had been instructed to discuss the company's affairs, Rubin would probably have kept his money, and this case never arisen.
 
 
 71
 This analysis forces the conclusion that a non-attorney who acted as Barnhart did would have possessed a duty to disclose. In light of what Barnhart did say about the Star Bank relationship, the things he did not say were highly material, and misleading. And it is well established in securities law that in a case involving a failure to disclose, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); Ockerman v. May Zima & Co., 27 F.3d 1151, 1159 (6th Cir.1994) ("In face-to-face transactions, reliance on a defendant's failure to disclose material information may also be presumed where the defendant had a duty to disclose.").
 
 
 72
 If anyone else having a duty to disclose knowingly failed to state a material fact, if the omission rendered other statements misleading, and if an investor relied on the misleading statements to his loss, that would be fraud. Why should it not be for Lawyer Barnhart? As the court recognizes, Rubin alleges that "the Todds encouraged [the plaintiffs] to contact SZ & D to confirm the representations being proffered by the Todds as to the financial condition of MDI and its need for additional capital." In the resulting conversations, Barnhart, counsel to MDI since its inception and speaking specifically at the behest of his client, undertook to furnish information and opinions regarding the Star Bank relationship--a subject well within the scope of a discussion about financial condition. Nonetheless, the court concludes that "[t]he status of loans to MDI from Star Bank was not relevant to those issues upon which Barnhart was hired to issue an opinion." (Op. at 1256-57). The court acknowledges that where "the attorney omits material information directly relevant to the purpose for which the attorney was hired, courts are inclined to hold counsel liable." Op. at 1255. Yet it then proceeds to absolve an attorney who was allegedly acting as a pitchman for his client, the issuer.
 
 
 73
 As shown, the court thus bases its decision on an erroneous analysis of the facts as we must assume them to be. Moreover, § 10(b) and Rule 10b-5 cover "any person," and I do not see where the law indicates that a person may escape liability for fraudulent omissions merely by virtue of being an attorney who was not specifically hired, in so many words, to have the interactions with the purchaser wherein the fraud occurred.[2] Such a holding creates an enormous opportunity for enterprising lawyers to tout their client's securities as a gratuitous service. Lawyers of a certain stripe would understand that helping a transaction to a successful conclusion would not be harmful to their compensation for the matter at hand, or to their prospects of engagement on future matters. If sued, they would be free to argue that their exchanges with the plaintiff were not contemplated by the direct terms of engagement by their principal, and were therefore non-actionable. The court's holding allows an attorney's duty of zealous advocacy[3] to pull in the same harness with his personal advantage.
 
 
 74
 As for affirmative misstatements, Barnhart allegedly told the investors that there was "no problem with the Star Bank and MDI," and that the bank would "look with favor upon an infusion of $153,000 in capital." Of course, there were problems: MDI was already in default, and the investment would constitute a further incident of default. The court acknowledges that, under Mayer v. Mylod, Barnhart's statements "may be sufficient" to amount to material misrepresentations (Op. at 1256), but then absolves Barnhart of liability for securities fraud because, it says, the plaintiffs were not justified in relying on the misrepresentations (Op. at 1257).
 
 
 75
 Unless the principle is to be that no reasonable investor would rely on anything said by his counter party's lawyer, the question is whether Rubin was required, on peril of losing his right to sue for fraud, to contact Star Bank directly, despite having been told everything was fine with the bank, that there was no need to contact the bank, and having no indication that the bank would be willing to discuss confidential business with a caller out of the blue. Obviously, Rubin and Weiss fell far short of the painstaking due diligence that, in contemporary corporate practice, is part of every large financing. Obviously, they could have insisted that SZ & D opine about matters beyond MDI's corporate status, including its relationship with Star Bank. Their imprudence was mitigated only by their not altogether softheaded gamble that they could count on the issuer's lawyer not to make statements of such breathtaking mendacity. This was, after all, an investment of only $153,000. The cost of full-bore due diligence will often be disproportionate to the size of a financing. Efficiency requires a modicum of trust. If every small investor had to nail down every source of information underpinning the representations made by the other side, lawyers might be extremely happy, but the business involved would ultimately be transacted at greater cost. Denying recourse to anyone who relies on factual misrepresentations by the other party's lawyer has a price attached, which must be absorbed by the market for capital.
 
 
 76
 I particularly disagree with the court's explanation for its holding that Rubin could not reasonably rely on the information Barnhart related. At one point, the court sets forth the eight factors that are used in this circuit to determine whether a plaintiff was reckless in relying on affirmative misrepresentations. Op. at 1254, quoting Molecular Technology Corp. v. Valentine, 925 F.2d 910, 918 (6th Cir.1991). I might be convinced that an application of these factors would spell recklessness on Rubin's part; Rubin was a sophisticated investor, there was no longstanding business or personal relationship between him and MDI or Barnhart, and Barnhart's misrepresentations were of a fairly general nature. In the end, however, the court's holding that the plaintiffs could not justifiably rely on Barnhart's misrepresentations is not based on such an analysis. Op. at 1256-57. Instead, it rests on a misunderstanding of the principle that a party who is represented by counsel cannot rely on the opinion of the other party's attorney.
 
 
 77
 That principle, as a reading of the cases cited by the district court reveals, is limited to reliance on the opinions or research of the other party's attorney on points of law. See Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1016 (2d Cir.1989) (alleged misrepresentation "concerned a statute that both parties were aware of, and even more important, the interpretation of that statute"); Morin v. Trupin, 711 F.Supp. 97, 104 (S.D.N.Y.1989) ("The misrepresentations allegedly made ... consisted of the legal position of the [defendant law firm's] clients. A party represented by counsel cannot establish justifiable reliance when the claim is premised upon the legal opinion of an adversary's counsel."); Verschell v. Pike, 85 A.D.2d 690, 445 N.Y.S.2d 489, 491 (1981) ("plaintiff's attorney was not justified in relying upon his adversary's statement that the lease was legal under the zoning ordinance"). The theory is that one's own lawyer ought to be able to detect and cure misleading statements of law from the other side. Extending the principle to factual representations would put an investor in far greater peril in speaking to an issuer's counsel than in speaking with the president of the company. In short, it allows an attorney to mislead investors with impunity. This is not a privilege afforded by a law degree.
 
 
 78
 I respectfully dissent.
 
 
 
 *
 The Honorable Harlington Wood, Jr., Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation
 
 
 [1]
 The parties and the District Court treat this case as one where the District Court dismissed the case under Rule 12(c) of the Federal Rules of Civil Procedure. However, the plaintiffs, in opposition to the defendants' motion for judgment on the pleadings, submitted two affidavits which were considered and discussed in the District Court's opinion. Thus, although not designated as such by the District Court, the judgment was one of summary judgment not judgment on the pleadings
 
 
 [2]
 Plaintiffs assert that MDI, at the time of the transaction, was in default of its revolving line of credit agreement with Star Bank. Appellants' Brief at 13. As support for this assertion, plaintiffs cite only to their complaint. There is in addition, however, a letter from Danny Todd to Rubin and Cohen dated March 30, 1992, that states:
 
 
 [1]
 MDI's incurring of indebtedness with you as well as its sale of shares of common stock to you, constitutes a default under certain Loan Documents with the Bank
 
 
 [2]
 In addition to the defaults described in Paragraph 1 above, MDI is in default of other provisions under the Loan Documents
 
 
 [3]
 The district court treated the motion as one for summary judgment because it considered attached affidavits in disposing of the claims
 
 
 [4]
 We decline to adopt the approach of the United States Court of Appeals for the First Circuit in Fiore v. Washington County Community Mental Health Center, 960 F.2d 229 (1st Cir.1992). In Fiore, the First Circuit held that a party waives the separate document requirement where it fails to act within three months of the trial court's last order in the case. Id. at 236. While that may be a pragmatic resolution of the problem, it is not supported by the rules or the Supreme Court's statements on the issue
 
 
 [5]
 Ultimately, the court reversed the jury verdict and remanded the case for a new trial due to inconsistent findings by the jury, misapplications of jury instructions and relevant law, and an excessive damage award. Id. at 921
 
 
 [6]
 The default provisions which Star Bank relied upon were in the loan agreements between MDI and Star. Although plaintiffs did not have the loan agreements, they had asked the Todds for them but went ahead with the loan prior to receiving them. Plaintiffs would require Barnhart to interpret these provisions for their benefit
 
 
 [7]
 The absence from the plaintiffs' amended complaint of material misrepresentations allegedly made by Barnhart and plaintiffs' submission of affidavits alleging misrepresentations in response to defendants' motion for judgment on the pleadings appeared to be in recognition of the weakness of their reliance on omissions as a basis for liability under Section 10(b)
 
 
 [1]
 I find no definite Ohio authority as to whether a bank has a duty to refrain from disclosing information about loan customers to unauthorized third parties. It is clear that "[t]he relationship of debtor and creditor without more is not a fiduciary relationship. A fiduciary relationship may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed." Umbaugh Pole Bldg. Co. v. Scott, 58 Ohio St.2d 282, 390 N.E.2d 320, 323 (1979). The record does not reveal, nor may we in this posture assume, that the relationship between MDI and Star Bank was such that Star Bank was at liberty to make unauthorized disclosures without breaching a duty to MDI. One Ohio court has suggested (in an unpublished opinion) that unauthorized disclosure of information about a corporate customer could expose the bank to an action for defamation. Third Nat'l Bank and Trust Co. v. Sinder, 1987 WL 12965, * 9 (Ohio.Ct.App. June 18, 1987). That proposition is a much-debated one, especially, though not exclusively, when it comes to disclosures to government investigators. See, e.g., Young v. United States Dep't of Justice, 882 F.2d 633, 642 (2d Cir.1989); Indiana Nat'l Bank v. Chapman, 482 N.E.2d 474, 482 (Ind.App.1985); Edward L. Raymond, Jr., Annotation, Bank's Liability, Under State Law, For Disclosing Financial Information Concerning Depositor or Customer, 81 A.L.R.4th 377, 391-94 (1990)
 Whatever Star Bank's legal authority to disclose may have been, this court should not assume that, as a matter of business practice, Star Bank would disclose a customer's default over the phone to an unknown inquirer. I agree with the Second Circuit, that "most depositors believe banks will keep their banking activities confidential. At the very least, banks have fostered that impression. The American Bankers Association counsels its members that customer account information should generally be kept confidential ... and acknowledges that most customers assume that banking transactions are confidential...." Young, 882 F.2d at 642-43.
 
 
 [2]
 If an issuer or its executives were to claim, in a 10b-5 action in which they were the defendants, that the attorney was operating beyond the scope of his authority, that defense might possibly have some merit. The surviving allegations of this suit, however, are against Barnhart and his firm, not the Todds or MDI
 
 
 [3]
 See MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.3 cmt. . Nor would the attorney be required by Rule 4.1(b) to "disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client," because, if the attorney were acting strictly on his own, there would be no fraudulent act by the client